# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01274-SCT

### *K.R. BORRIES, INDIVIDUALLY, d/b/a K.R. BORRIES CONSTRUCTION COMPANY*

### *v.*

### *GRAND CASINO OF MISSISSIPPI, INC. BILOXI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/30/2012 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS, JR. |
| TRIAL COURT ATTORNEYS: | CHRISTOPHER H. CORKERN |
| | ALAN M. PURDIE |
| | DION J. SHANLEY |
| | JOHN P. KAVANAGH, JR. |
| | KASEE S. HEISTERHAGEN |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHRISTOPHER HAILEY CORKERN |
| | ALAN M. PURDIE |
| ATTORNEYS FOR APPELLEE: | KASEE SPARKS  HEISTERHAGEN |
| | JOHN P. KAVANAGH, JR. |
| NATURE OF THE CASE: | CIVIL - PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND REMANDED - 03/31/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.    This case arises from property damage suffered by Borries Construction when Grand Casino's gambling barges broke loose from their moorings and collided with the Schooner Pier and surrounding structures during Hurricane Katrina. Following Hurricane Katrina, K.R.

Borries filed suit on behalf of himself and his construction company against Grand Casino. Grand Casino filed a motion for summary judgment, which the circuit court granted.

¶2.    Borries now appeals, alleging that Grand Casino breached its duty of care to Borries by negligently mooring its casino and failing to take precautions to prevent foreseeable harm to nearby property owners. This Court reverses the trial court's grant of summary judgment because there was a battle of the experts, and the issue should have been presented to a jury.

## FACTS AND PROCEDURAL HISTORY

¶3.    In 1994, Grand Casino opened and operated a floating barge casino on the Mississippi Gulf Coast. Grand Casino was licensed by the Mississippi Gaming Commission in accordance with the commission's hurricane preparedness policy. The policy required that "cruise vessels utilized for gaming on the Mississippi Gulf Coast, in the Biloxi Bay[,] or in the Bay of St. Louis, that are not self propelled, are to be moored to withstand a Category 4 Hurricane with 155 mile per hour winds and fifteen-foot tidal surge." Mississippi Gaming Commission Regulation § II(B)(10). The Gaming Commission originally set forth the policy in 1994, and amended it in 1995 and 1997 to reduce the wind-speed requirements, but left intact its requirements that barges be moored to withstand a fifteen-foot storm surge. The Gaming Commission issued a license to the Grand Casino barge for operation as compliant with the Commission's hurricane policy.

¶4.    In 1999, Grand Casino moored an additional eight-million-pound barge, the Lady Luck, to the Grand Casino barge. The Lady Luck was not separately licensed. On August 29, 2005, Hurricane Katrina tore the Grand Casino and the Lady Luck from their moorings.

After being cast adrift, the Grand Casino barge was separated from the Lady Luck. Allegedly, either the Grand Casino or the Lady Luck addition collided with its neighbor, the Schooner Pier. Prior and up to the impact of Hurricane Katrina, the Schooner Pier had been under construction by K.R. Borries, doing business as Borries Construction.

¶5. Borries subsequently filed a complaint against Grand Casino for negligence and gross negligence arising out of the property damage he sustained. Grand Casino filed a motion for summary judgment, arguing that the barge was moored in accordance with the requirements of the Mississippi Gaming Commission, and that it owed no duty because Hurricane Katrina was an Act of God and unforeseeable. To support its motion for summary judgment, Grand Casino submitted three supporting affidavits from Gordon Reigstad, David Mitchell, and Clifford Green. Reigstad, a licensed Mississippi engineer, attested that Grand Casino's mooring system met and exceeded the fifteen-foot, storm-surge Gaming Commission requirement and was designed to accommodate a seventeen-foot storm surge. Mitchell, a consulting forensic meteorologist, testified that the maximum storm surge at the location of the Grand Casino was over twenty-one feet, and that wave action would have added an additional three to four feet. Green, past president of a consulting firm, testified that Grand Casino's mooring system complied with the Gaming Commission's guidelines and was able to withstand fifteen-foot storm surge.

¶6. Borries submitted affidavits from two experts, Dr. William Dally and Edward Geoffrey Webster. Both experts testified that the Grand Casino mooring system was designed to accommodate a fifteen-foot storm surge but because of prior storm history, Grand

Casino's mooring system should have been based on the known maximum surge heights of Hurricane Camille, which struck the Gulf Coast in 1969. The trial court granted Grand Casino's motion for three reasons.

> First, Plaintiff's argument that Defendant breached its duty fails because Plaintiff does not present anything other than generic references about Hurricane Camille's storm surge at the location of the Grand Casino. Second, the Mississippi Gaming Commission had knowledge of Camille's storm surge and still set the standard for moorings at 15 feet and Grand Casino followed the Gaming Commission's regulation. Finally, even if Plaintiff had presented adequate facts showing Camille's storm surge reached certain heights at the location of the Grand Casino, the one-time occurrence, without more, does not set the applicable standard of care that must be exercised for every building project thereafter.

¶7.    Borries filed a motion to reconsider and/or to alter or amend the judgment. The motion was denied.  Borries appealed to this Court raising the following two issues:

1.    **Whether the circuit court erred in finding that Grand Casino did not breach its duty to take reasonable precautions to protect those in close proximity of its barges because it complied with the Mississippi Gaming Commission's regulations.**

2.    **Whether the circuit court erred by applying the Act of God defense to Grand Casino.**

**STANDARD OF REVIEW**

¶8.    A trial court's grant of summary judgment is reviewed de novo. ***Davis v. Hoss***, 869 So. 2d 397, 401 (Miss. 2004).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Miss. R. Civ. P. 56( c). "Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to

4

one version of the matter in issue and another says the opposite." ***Williamson ex rel. Williamson v. Keith***, 786 So. 2d 390, 393 (Miss. 2001) (citing ***Heigle v. Heigle***, 771 So. 2d 341, 345 (Miss. 2000)). The moving party has the burden of demonstrating that no genuine issue of fact exists, while the non-moving party should be given the benefit of every reasonable doubt. ***Tucker v. Hinds County,*** 558 So. 2d 869, 872 (Miss. 1990). "The nonmoving party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there are genuine issues for trial." ***Richmond v. Benchmark Constr. Corp.***, 692 So. 2d 60, 61 (Miss. 1997). "If any triable issues of fact exist, the lower court's decision to grant summary judgment will be reversed. Otherwise the decision is affirmed." ***Id.***

## ANALYSIS

1. **Whether the circuit court erred in holding that no genuine issue of material fact existed regarding Grand Casino's breach of its duty to take reasonable precautions to protect those in close proximity to the Grand Casino.**

¶9.     To prove a negligence claim, Borries must show that (1) Grand Casino owed it a duty; (2) Grand Casino breached that duty; (3) there was a causal connection between the breach of duty and the alleged injury to Borries; and (4) Borries suffered damages. *See **Rein v. Benchmark Constr. Co.***, 865 So. 2d 1134, 1143 (Miss. 2004) ("Duty and breach of duty are essential to finding negligence and must be demonstrated first.") It is undisputed that Grand Casino owed a duty to property owners in close proximity to take reasonable measures to prevent foreseeable injuries in the event of a hurricane. *See **Eli Inv., LLC v. Silver Slipper Casino Venture, LLC***, 118 So. 3d 151 (Miss. 2013). This Court must determine whether

Borries presented sufficient evidence to create a material fact as to whether Grand Casino breached its duty.

¶10.    On appeal, Borries claims that this case is identical to *Eli,* where this Court reversed summary judgment because both parties presented affidavits from experts, establishing a battle of the experts. In *Eli*, Silver Slipper Casino was torn from its mooring during Hurricane Katrina and collided with a hotel owned by Eli. *Id*. at 153. Eli alleged that Silver Slipper had breached its duty to take reasonable steps to prevent foreseeable harm to property owners during Hurricane Katrina. *Id*. at 155. Eli's expert opined that, because of prior storm history, Hurricane Katrina's storm surge was foreseeable, but that Silver Slipper had failed to consider what would happen if its barge encountered a significant storm surge in light of three other hurricanes at that casino's location. *Id*. This affidavit was supported by statistics from the National Oceanic and Atmospheric Administration (NOAA) citing at least three hurricanes with storm surges of greater than fifteen feet in the Mississippi Gulf Coast prior to Hurricane Katrina. *Id*. Further, Eli's expert attested that "the moorings used to restrain a vessel in position along a dock in a marina were not sufficient to restrain the President Casino if it encountered a significant storm surge, as experienced along the Mississippi Gulf Coast during prior hurricanes." *Id*.

¶11.    Silver Slipper's expert opined that it did not breach its duty because the casino was moored in compliance with the Mississippi Gaming Commission's regulations "to withstand a Category 4 hurricane with 155 mile per hour winds and 15 foot tidal surge." *Id*. Further, the casino did not float free of its moorings until the storm surge exceeded the fifteen-foot

6

tidal surge required by the Gaming Commission. *Id*. This Court found that the "differing opinions established a 'battle of the experts' on the issue of whether Silver Slipper took reasonable steps to secure the President Casino to prevent foreseeable harm to nearby property owners." *Id*. This Court agrees that the present case is factually and legally identical to *Eli*, and that the trial court erred by granting summary judgment in favor of Grand Casino.

¶12. Borries's experts both agreed that "the Grand Casino's mooring system was designed to accommodate a fifteen foot (15') surge and wave elevation," which is required by the Mississippi Gaming Commission, but further testified that "the exercise of reasonable engineering judgment would have resulted in a design for the Grand Casino barges that would exceed the known maximum surge heights created by Hurricane Camille for this area of the Gulf Coast." Dally testified that "Camille, an extremely strong Category five (5) hurricane, ravaged the coast with winds approaching 190 mph and an estimated storm surge of approximately thirty feet (30') in some areas of the Mississippi gulf coast." Dally also testified that Grand Casino was negligent by adding the Lady Luck to Grand Casino's mooring system without designing a separate mooring system to provide the additional support. Webster, a naval architect and marine engineer, testified that:

> In light of the surge precedent set by Camille, the design of the Grand Casino's gambling barge was clearly insufficient. The wind and surge levels produced by Camille should have been the engineering benchmark for constructing and designing Grand Casino's gambling barges and not the Grand's attempt to comply with the Gaming Commission's minimum licensing requirements.

¶13. Webster also provided alternate design illustrations that Grand Casino could have implemented in the construction of the mooring system. Webster further testified that "it is

7

more probable than not that the Grand Casino barge and the Lady Luck addition would have remained in place had the barges been scuttled or sunk to the sea bottom prior to Katrina."

¶14.    According to Reigstad's affidavit,  the mooring system was designed in compliance with the Gaming Commission, and the system allowed the casino barge to float above seventeen feet vertically above the mean sea level. Mitchell stated that the maximum storm surge exceeded twenty-one feet, but with the wave action adding an additional three to four feet, the maximum storm surge was approximately twenty-four to twenty-five feet.  Green testified that Grand Casino's mooring system design complied with the Gaming Commissions regulations.[1]

¶15.    The trial court found that "Grand Casino met its duty to take reasonable measures to prevent foreseeable injuries because it designed and built its mooring system to meet the requirements set forth in the Mississippi Gaming Commission's Hurricane Preparedness Policy." Citing *Bay Point High & Dry, LLC v. New Palace Casino, LLC*, 46 So. 3d 821 (Miss. Ct. App. 2010), the trial court further found that the Commission's issuance of a license to Grand Casino was "strong proof" of its compliance. However, in *Eli*, this Court stated that "compliance with [the] Gaming Commission regulations does not automatically shield it from liability." *Eli*, 118 So. 3d at 155. "State boards and commissions are creatures of statute and have no powers other than those delegated to [them] by the Legislature." *Id*. Therefore, Grand Casino's compliance with the Gaming Commission's regulations is not

---

[1] We note that at the summary judgment hearing, the trial court struck the paragraph from the record where Green made this statement.

necessarily a fulfillment of its duty to prevent foreseeable harm to property owners in close proximity in the event of a hurricane.

¶16.   In *Bay Point*, Reigstad was an expert witness and testified that New Palace's mooring system met and exceeded the Gaming Commission's regulations because it could withstand storm surge of eighteen feet. *Bay Point*, 46 So. 3d at 824-25. The Court found that, because the mooring system met the Gaming Commission's standard and exceeded the standard, New Palace had met its duty. *Id*. at 825. Further, a colonel with the United States Air Force testified that the storm surge of Hurricane Camille near the location of New Palace ranged between thirteen to fifteen feet. *Id*. Following Hurricane Camille, it was foreseeable that storm surge could reach up to fifteen feet in that area. *Id*. But before Hurricane Katrina, it was not foreseeable that the storm surge could reach higher than fifteen-feet. *Id*. Because the mooring system met and exceeded the Gaming Commission's requirement of a fifteen foot storm surge, the maximum of Camille's storm surge in that area, New Palace took reasonable measures to prevent foreseeable harm. *Id*.

¶17.   Here, however, a question remains whether Grand Casino took reasonable measures to prevent harm if it moored its barges to withstand only up to seventeen feet of storm surge, and there is conflicting testimony that Camille's storm surge was at least twenty-one feet.

¶18.   Grand Casino contends that there was no "battle of the experts" because both parties agreed that Hurricane Katrina's maximum surge was over twenty-four feet, compared to the twenty-one foot storm surge of Hurricane Camille, making Hurricane Katrina unforeseeable. Grand Casino states that it wasn't until after the trial court granted summary judgment that

9

Dally submitted a second supplemental affidavit, stating that Hurricane Camille's storm surge was between twenty-one and thirty feet, rather than simply twenty-one feet. Even had it moored its barges to withstand a twenty-one-foot storm surge, the maximum height of Hurricane Camille, Grand Casino asserts that the damage to the Schooner Pier was inevitable because Hurricane Katrina's storm surge was at least twenty-four feet.

¶19.   While there was no inconsistency in Dally's affidavit with regard to the maximum storm surge of Camille, there was some ambiguity. In his original affidavit, Dally stated that Camille's storm surge was estimated at thirty feet in some areas of the Gulf Coast, although he did not specify the locations. In his forensic engineering report, he stated that Hurricane Camille's maximum storm surge was twenty-five feet, specifically at Pass Christian and Long Beach. Dally's second supplemental brief, which was submitted after the trial court granted summary judgment, stated again that Hurricane Camille's estimated storm surge was as high as thirty feet along the Mississippi coastline, but clarified that the storm surge was between twenty-one and thirty feet. During the hearing on Borries's motion to reconsider, Borries acknowledged that the second supplemental affidavit was entered after the trial court's ruling on summary judgment, but it was entered for clarification because there were ambiguities in the affidavit.

¶20.   In its order, the trial court stated, "Plaintiff suggested during oral argument that the barge moorings might have failed before the surge exceeded fifteen feet, however, the record does not support Plaintiff's suggestion." Dally's testimony was inconsistent with regard to

10

Grand Casino's compliance with the regulations and whether the moorings broke before or after the storm surge rose to fifteen feet. In his original affidavit, Dally testified that:

> [T]he Grand Casino's mooring system was designed to accommodate a fifteen foot (15') surge and wave elevation. . . . In all probability, on August 29, 2005, the Grand Casino barge floated upwards with the rising storm surge and increasing wave height, until the mooring collars locked at the top of the mooring pipes. This combined effect of surge and waves occurred at fifteen feet (15') above mean sea level. As the surge and waves reached heights in excess of fifteen feet (15'), the uplift buoyancy forces grew until the collars and connections failed and the barge was set adrift.

¶21. In his forensic engineering analysis, Dally stated that on the morning of August 29, 2005, the mooring system failed at approximately 8:30 a.m. with the "surge elevation roughly 1.5-2.0 ft below the limit, i.e. +13.5 to +14 ft." In his first supplemental affidavit, Dally stated:

> As stated in my original affidavit, it is my opinion that the Grand Casino and Lady Luck mooring systems were not in compliance with the Gaming Commission's licensing criteria as concerns wind and surge resistence. As stated in my report, it is my belief that the main barge's mooring system failed prior to its design limits on August 29, 2005.

¶22. Dally's testimony is inconsistent in that he first testified that the mooring system was compliant with the Gaming Commission's regulations and the mooring collars failed *after* the storm surge was above fifteen feet. However, in his forensic analysis, which was attached to his original affidavit, he stated that the mooring system failed when the surge was between 13.5 to 14 feet, before reaching the fifteen-foot benchmark. However, in his first supplemental affidavit, Dally testified that Grand Casino's mooring system was not compliant with the regulations and restated his position that the mooring systems failed before it reached the design limit of fifteen feet. In *Foldes v. Hancock Bank*, 554 So. 2d 319,

11

321 (Miss. 1989), this Court has stated that "the nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony."

¶23. Only Borries, through Dally's affidavit, submitted that Camille's storm surge rose to twenty-one feet. The trial court noted that Dally failed to identify the location of the "21 foot storm surge" and the source from which he received this information. The Court also noted that the NOAA report contradicted Dally's finding, and that because he was not a meteorologist, he could not proffer such testimony. As a footnote to the judge's order, he stated, "[i]n addition to his affidavit, Dally's report does not clearly identify the sources of all of its meteorological data, it references websites such as "Weather Underground," and cites to deposition testimony that was not taken in the present case . . . . Further, Dally's report makes several assertions that are outright legal conclusions." Although he is not a meteorologist, Dally is an experienced engineer with more than thirty years of experience in coastal and ocean engineering. Further, according to the NOAA report provided in the court record, Hurricane Camille's storm surge was 24.2 feet.

¶24. Although inconsistency existed in Dally's affidavits, similar to *Eli*, the parties' experts in this case have merely provided differing opinions. Borries has offered evidence that Grand Casino's mooring system was not adequate to withstand Hurricane Katrina and that because of prior storm history, Hurricane Katrina's storm surge was foreseeable. Grand Casino has presented competing evidence that, because of its compliance, it is not liable. These differing

12

opinions establish a "battle of the experts." Because a genuine dispute of material fact exists regarding Grand Casino's duty, the trial court's decision is reversed.

### 2. Whether the circuit court erred by applying the Act of God defense to Grand Casino.

¶25. The trial court found that Hurricane Katrina was an Act of God. The "Act of God" defense is an affirmative defense to the element of causation. "No one is liable for an injury proximately caused by an act of God, which is an injury due directly and exclusively to natural causes without human intervention, and which could not have been prevented by the exercise of reasonable care and foresight." *City of Jackson v. Brummett*, 224 Miss. 501, 507, 80 So. 2d 827, 829 (1955). "[T]he 'Act of God' defense 'applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them.'" *McFarland v. Entergy Miss., Inc.*, 919 So. 2d 894, 904 (Miss. 2006) (quoting *Skandia Ins. Co. v. Star Shipping*, 173 F. Supp. 2d 1228, 1239 (S.D. Ala. 2001). However, an injury which could have been prevented through the use of ordinary care is not an Act of God which would absolve the tortfeasor from liability. *City of Hattiesburg v. Hillman*, 222 Miss. 443, 450, 76 So. 2d 368, 370 (1954).

¶26. Because Borries has presented evidence to create a genuine issue of material fact as to whether Grand Casino negligently moored its barge to withstand Hurricane Katrina, if the jury finds that Grand Casino could have prevented the damage to Borries's construction site, the Act of God defense will not apply. *See Eli*, 118 So. 3d at 156. We find that Grand Casino is not entitled to summary judgment based on the Act of God defense.

### CONCLUSION

¶27. Because Borries has submitted sufficient evidence showing that material facts exist as to whether Grand Casino breached its duty to take reasonable measures to prevent foreseeable harm to nearby property owners, we find the circuit court improperly granted judgment in favor of Grand Casino. Therefore, we reverse the judgment of the Circuit Court of Harrision County and remand the case for proceedings consistent with this opinion.

¶28. **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, KING, COLEMAN AND MAXWELL, JJ., CONCUR.**