# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01570-COA

**GREAT SOUTHERN EXCAVATORS, INC.,**  
**GREAT SOUTHERN SHELL, INC.,**  
**CHRISTOPHER E. LOVELACE AND EDWARD**  
**C. LOVELACE, JR.**

APPELLANTS

**v.**

**TEC PARTNERS, LLP AND JEFFREY A.**  
**TURNIPSEED**

APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 09/17/2015 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | CLARENCE MCDONALD LELAND |
| ATTORNEY FOR APPELLEES: | ALEXANDER FREDERICK GUIDRY |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| TRIAL COURT DISPOSITION: | GRANTED SUMMARY JUDGMENT IN FAVOR OF APPELLEES |
| DISPOSITION: | REVERSED AND REMANDED: 04/18/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND FAIR, JJ.**

**FAIR, J., FOR THE COURT:**

¶1.     This is an accounting malpractice case. In 2001, Great Southern Excavators Inc. and Great Southern Shell Inc. (collectively Great Southern) hired Jeffrey Turnipseed, a member of accounting firm TEC Partners LLP (TEC), to provide accounting and tax services. Both Great Southern corporations were majority owned and operated by two brothers – Christopher Lovelace and Edward Lovelace Jr.[1]

---

[1] Christopher and Edward each owned forty-nine percent of the company stocks, and their mother owned the remaining two percent.

¶2.     The Lovelaces claimed Turnipseed was hired to oversee their office manager (and aunt) Anita Musgrove in calculating and depositing payroll taxes.  In 2004, the IRS alerted Great Southern that it owed back federal payroll taxes.  The matter was resolved, but another filing deficiency happened two years later.  Great Southern later discovered Musgrove had been embezzling company funds.  Great Southern sued TEC and Turnipseed for failure to ensure the payroll tax deposits were made timely and for failure to report Musgrove's embezzlement of company funds.

¶3.     After years of litigation, TEC moved for summary judgment, which was granted by the circuit court.  Great Southern appeals, asserting the circuit judge erred in finding that: (1) expert testimony was required to prove that TEC breached the applicable standard of care; and (2) Great Southern's expert failed to state how TEC breached that standard of care.  The case hinges on whether or not Turnipseed and TEC agreed to weekly review by TEC of payroll taxes (Great Southern's employees were paid weekly) – a responsibility not set out in the original written contract.  We find that there remain questions of material fact between the parties, and therefore the circuit court erred in granting TEC's motion for summary judgment. We reverse and remand.

**FACTS**

¶4.     Great Southern originally hired TEC to prepare monthly financial statements, prepare tax returns, perform a review of financial statements, and prepare profit/loss reports on a per-job basis.  The 2001 engagement letter set out the nature and limitations of TEC's services in which these monthly services would be performed for a monthly fee of $775.   Other

2

services, including review of the payroll account by request, were performed and charged for as required.

¶5. In 2004, the IRS discovered that Great Southern had not paid its federal payroll taxes. Funds owed to the IRS in Great Southern's payroll account had not been electronically transferred to the IRS account in the same bank. After a meeting with the IRS, funds remaining in the account were immediately deposited with the IRS, and the issue was attributed to an error related to the company computer and its operator, Musgrove.

¶6. In the summer of 2006, Great Southern realized there was still a problem with the federal payroll taxes. The corporation immediately alerted the IRS and paid the taxes a few months later with proceeds from loans secured by corporate property. During its review, the IRS notified Great Southern that there was an embezzlement problem. An investigation by Great Southern ensued, and the embezzler was revealed – Musgrove. She had been getting the refund checks and depositing them into her personal account. Musgrove was arrested, pled guilty, and served a two year prison sentence.

¶7. Great Southern sued Turnipseed and TEC, submitting that they violated their duty based on an agreement between Christopher and Turnipseed – that Turnipseed would come to the office weekly to ensure that the funds due to the IRS were actually transferred from the payroll account to the IRS account. In support of Great Southern's claim, Christopher stated that, after the 2004 problem, Turnipseed came to Great Southern's office weekly to make sure the payroll taxes were paid. Musgrove testified to the same effect. TEC denied that it "originally agreed" to monitor Great Southern's federal payroll taxes, as the 2001

3

engagement letter did not include those tasks. Turnipseed did not testify, but a TEC officer testified that Turnipseed only went to the office once or twice a year before 2006.

¶8. Great Southern designated Donna Ingram, a forensic accountant, as an expert. During discovery, Ingram submitted a preliminary report pointing out what appeared to her to be an accounting error, but she noted that the opinion was based on a preliminary review of various records, since she had not yet reviewed TEC's work product in detail. TEC and Turnipseed filed a motion for summary judgment, claiming that Great Southern's expert had failed to provide testimony showing that TEC breached its duty to Great Southern. In response, Great Southern submitted a supplemental affidavit from Ingram (based on her review of some of TEC's work product produced in discovery). The nine-page affidavit concluded that, "[i]n their failure to comply with professional accounting standards, TEC caused [Great Southern] to incur tax penalties and make business decisions based on unreliable financial data."

¶9. The circuit court granted TEC's motion for summary judgment, from which Great Southern appeals.

## STANDARD OF REVIEW

¶10. "In reviewing a trial court's grant or denial of summary judgment, the well-established standard of review is de novo." *Crist v. Loyacono*, 65 So. 3d 837, 842 (¶12) (Miss. 2011). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." M.R.C.P. 56(c). "The evidence must be viewed in the light most favorable to the party against whom the motion has been made." *Crist*, 65 So. 3d at 842 (¶12) (citation omitted).

## DISCUSSION

¶11. "To distinguish between malpractice claims and ordinary negligence, a court should consider: '(1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of professional judgment beyond the realm of common knowledge and experience.'" *Crosthwait v. S. Health Corp. of Houston*, 94 So. 3d 1126, 1130 (¶11) (Miss. Ct. App. 2011) (quoting 65 C.J.S. *Negligence* § 160 (2010)). According to Great Southern's complaint and Ingram's reports, Great Southern's claims against TEC arose out of alleged errors or omissions that occurred within the course of TEC's professional accounting relationship with Great Southern. So the nature of this case qualifies Great Southern's claim as malpractice.

¶12. In an accounting malpractice case, "the existence of certain factors must be proven by a preponderance of the evidence[:] . . . 1. Existence of [an accountant]-client relationship[;] 2. Negligence on the part of the [accountant] in handling his client's affairs entrusted to him; and 3. Proximate cause of injury." *Wirtz v. Switzer*, 586 So. 2d 775, 779 (Miss. 1991) (abrogated on other grounds by *Upchurch Plumbing Inc. v. Greenwood Utils. Comm'n*, 964 So. 2d 1100, 1118 (¶45) (Miss. 2007)). Additionally, expert testimony is required to prove that the professional failed to exercise his knowledge, skill, or ability. *Id.*

5

at 781.

¶13.   During discovery, Ingram submitted a preliminary report pointing out what appeared to her to be an accounting error, but she noted that the opinion was based on a preliminary review of various records,  since she had not yet reviewed TEC's work product in detail.  It was her general opinion that:

> TEC and Turnipseed had access to data, which if reviewed, would have led to the discovery that the payroll taxes were not being paid.  Had this discovery been made timely, and the payroll taxes paid weekly as required by the IRS, [the office manager] would have had less opportunity to embezzle money from [Great Southern].  Also, [Great Southern's] management would have had accurate financial information to make informed decisions regarding the Company's operations.

Ingram's report did not explicitly state that TEC breached that standard of care. She did, however, specifically refer to the general and specific agreements for TEC and Turnipseed, as accountants, to review payroll tax records, and as noted above, discover payroll taxes were not paid, resulting in damages.

¶14.   In opposing summary judgment, Great Southern provided Ingram's supplemental affidavit, which stated the following:

> The professional accounting standards for review engagements state the accountant should perform additional procedures if the accountant determines such procedures to be necessary to obtain limited assurance that the financial statements are not materially misstated. The workpapers provided by TEC in discovery reflect the numerous occurrences of inconsistent data, unexpected financial relationships and balances (which should remain constant) changing by material amounts from period-to-period. Had TEC properly investigated these occurrences they would have discovered the erroneous cash balances and the failure to timely and properly remit payroll taxes.  In their failure to comply with professional accounting standards, TEC caused [Great Southern] to incur

6

tax penalties and make business decisions based on unreliable financial data. By not promptly detecting errors in case and other general ledger accounts TEC also provided Anita Musgrove an opportunity to embezzle money from [Great Southern].

Ingram detailed numerous TEC documents showing how, in her opinion, Turnipseed failed

to comply with professional accounting standards:

> TEC [document] 000638 shows that TEC proposed adjusting journal entry AJE # 1 for November 30, 2003, and adjusted three cash accounts, including the payroll checking account. A CPA will not generally adjust a cash account without first reviewing the reconciliation to make sure the entry is valid and accurate.
>
> . . . .
>
> The description on the AJE referred to . . . above is "to adjust to actual as of 12/31/2002." These were not amounts that were adjusted initially by TEC in their 2002 review engagement, but rather differences in the reports generated by QuickBooks. In theory, the December 31, 2002 balances generated at the conclusion of TEC's 2002 review should be identical to the December 31, 2002 balances produced by QuickBooks at any later date. Unfortunately, this was not what happened. When TEC produced the balance sheet in December 2003, the December 31, 2002 balances for many accounts had changed, including the cash and equity accounts. For TEC to "roll" equity in their November 2003 compilation they had to process this correcting entry. It is doubtful that a minimally competent CPA would fail to investigate the cause for this change, especially since the impact to the two equity accounts was over $160,000; three cash accounts required adjustment; and another account balance had to be adjusted for almost $400,000.
>
> . . . .
>
> TEC [document] 001113 shows TEC proposing a December 31, 2002 entry to adjust account 111.020 which is the payroll checking account at Community Bank and TEC [document] 001114 shows TEC proposing corrections to five cash accounts as of November 30, 2003, three of which are payroll bank accounts. Again, a CPA will not generally adjust a cash account without first reviewing the reconciliation to make sure the entry is valid and accurate.

7

. . . .

TEC in its response to [Great Southern's] First Set of Interrogatories and Request For Production of Documents states on page 3 that Chris Lovelace approached Turnipseed and asked him to provide additional services to help Musgrove. Then on page 4, TEC responds "Turnipseed did not begin assisting Musgrove until late July or early August in 2006[.]"

. . . .

TEC's June 16, 2006, invoice described the work performed as "Work performed through May 31, 2006 " and was for $1,150, which is far different than the $775 per month set forth in the engagement letter.

. . . .

TEC's July 17, 2006, invoice described the work performed as "Work performed through June 30, 2006 " and was for $875, which is also different from the $775 per month set forth in the engagement letter.

. . . .

[B]ased on their workpapers, TEC did not investigate an increase in payroll liabilities from the prior year of approximately $150,000, or more than 300%, while conducting their analytical review procedures as part of the 2005 review engagement. A minimally competent accountant should have questioned why the balances increased from period to period, especially one that knew that payroll tax payments previously had not been remitted timely . . . .

¶15.   After review, we find Ingram's affidavit presented material questions of fact that preclude summary judgment. We also find that Ingram's testimony properly stated TEC had a duty to comply with professional accounting standards and breached that duty when it failed to comply with those standards. If, in fact, Turnipseed appeared weekly and reviewed the payroll records, then, according to Ingram, he should have recognized and investigated

8

evidence of possible embezzlement. If he did not review the records weekly, and he had agreed to do so, then that failure constitutes malpractice and breach of a contract by a professional. The issue presented, therefore, is what, if anything, was Turnipseed's duty to review payroll payment activity weekly and to ensure deposit of funds due to the IRS. The issue is one to be decided on the merits at a trial.

¶16. As for further details of the factual dispute regarding Turnipseed's duty to Great Southern, Christopher, Edward, and Musgrove testified under oath and in depositions that, beginning in 2004, Turnipseed came to the office weekly to make sure the payroll taxes were remitted. Christopher stated that he requested Turnipseed to do so and Turnipseed agreed. TEC, however, claimed that Turnipseed did not come on a weekly basis to help with the payroll taxes until early fall of 2006. The record contains some evidence that the billing of significant activity of TEC through Turnipseed was not covered by the 2001 engagement agreement. As previously stated, Turnipseed did not testify. Christopher, Musgrove, and Great Southern's expert, Ingram, also testified that Turnipseed reviewed bank statements that showed an error in the cash balances. TEC said that Turnipseed did not. "Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite." *K.R. Borries v. Grand Casino of Miss. Inc. Biloxi*, 187 So. 3d 1042, 1046 (¶8) (Miss. 2016). The existence of an agreement by Turnipseed to monitor on a weekly basis, and charge Great Southern for doing so, is a material issue of fact, appearing in deposition testimony and

affidavits of six people. Determining the credibility of those persons is the province of the fact-finder.

¶17. TEC also argues for the first time on appeal that Ingram's affidavit was submitted after the discovery deadline and therefore in violation of Uniform Rule of Circuit and County Court 4.04. TEC waived this argument when it failed to object at the summary-judgment stage. *See Moore v. M&M Logging Inc.*, 51 So. 3d 216, 220 (¶8) (Miss. Ct. App. 2010). Even so, Mississippi Rule of Civil Procedure 56(c) states that "[t]he adverse party prior to the day of the [summary judgment] hearing may serve opposing affidavits." M.R.C.P. 56(c). Great Southern complied in submitting Ingram's affidavit the day before the hearing. Further, "when an expert's opinion is challenged, the party sponsoring the expert's challenged opinion [must] be given a fair opportunity to respond to the challenge." *Kilhullen v. Kan. City S. Ry.*, 8 So. 3d 168, 174 (¶13) (Miss. 2009). Because TEC claimed that Ingram failed to show that TEC breached its duty to Great Southern, Great Southern was entitled to respond.

¶18. Based on Ingram's testimony and the disputed facts listed above, we find summary judgment was improper.

¶19. **THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**