# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01267-COA

| | |
|---|---|
| JESSICA LAMBERT MOORE, ADMINISTRATRIX OF THE ESTATE OF JASMINE LYNETTE MOORE, DECEASED | APPELLANT/ CROSS-APPELLEE |

v.

| | |
|---|---|
| STA-HOME HEALTH AGENCY OF CARTHAGE, INC., STA-HOME HEALTH AND HOSPICE, INC., CANDACE HOFFER, R.N., KATRINA TROSPER, R.N., KASONYA BOYD, R.N., ANDERSON REGIONAL MEDICAL CENTER, DALE HIGGINBOTHAM, N.P., RUSH MEDICAL FOUNDATION, INC. D/B/A RUSH FOUNDATION HOSPITAL, PHYSICIAN SERVICES, LLC, LINUS MARTIN, M.D., AND ELIZABETH SIMS, N.P. | APPELLEES/ CROSS-APPELLANTS |

DATE OF JUDGMENT: 11/06/2023
TRIAL JUDGE: HON. CHARLES W. WRIGHT JR.
COURT FROM WHICH APPEALED: LAUDERDALE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: CHARLES MAURICE STAM
    DAVID C. DUNBAR
    TINA MARIE BULLOCK
    BRIAN D. SPIELMAN
ATTORNEYS FOR APPELLEES: WHITMAN B. JOHNSON III
    JOHN G. WHEELER
    ROMNEY HASTINGS ENTREKIN
    LISA WILLIAMS McKAY
    PEELER GRAYSON LACEY JR.
    BENJAMIN BLUE MORGAN
NATURE OF THE CASE: CIVIL - MEDICAL MALPRACTICE
DISPOSITION: ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED - 03/24/2026
MOTION FOR REHEARING FILED:

    **EN BANC.**

    **WILSON, P.J., FOR THE COURT:**

¶1. Jessica Moore filed this medical malpractice lawsuit on behalf of her daughter, Jasmine, alleging that the defendants—two hospitals in Meridian, a home health agency, and individual doctors and nurses employed by them—negligently failed to diagnose or monitor Jasmine's condition or communicate with Jasmine's primary treating physician, a pediatric neurosurgeon in New Orleans. Moore alleges that but for the defendants' negligence, there is a reasonable probability (i.e., a greater than fifty-percent chance) that Jasmine would have avoided significant brain damage. The circuit court granted summary judgment in favor of all defendants, and Moore appealed. We conclude that all defendants are entitled to summary judgment on the issue of causation. Therefore, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Jasmine was born prematurely in 2004. She was later diagnosed with hydrocephalus, cerebral palsy, developmental and cognitive delays, behavior disorders, and seizures, among other medical issues. In 2006, doctors placed a shunt in Jasmine's brain to treat hydrocephalus, an abnormal buildup of cerebrospinal fluid (CSF) within the brain. The shunt's purpose was to drain CSF away from the brain and relieve pressure on the brain. The shunt was replaced in 2009.

¶3. On February 26, 2016, Jasmine went to the emergency department at the University of Mississippi Medical Center (UMMC) with complaints of vomiting, refusing to eat or drink, abdominal pain, falling, unsteady gait, and fatigue. Jasmine underwent testing and was discharged on February 29. Just three days later, on March 3, Jasmine went to the emergency department at Rush Hospital (Rush) in Meridian with seizures. The same day,

2

she was transferred by ambulance to Children's Hospital in New Orleans (CHNO). There, Dr. Lori McBride, a pediatric neurosurgeon, diagnosed Jasmine with a shunt infection (a Group B streptococcal bacterial infection) due to a shunt malfunction and occlusion in the shunt. Dr. McBride performed a shunt revision and partially replaced the shunt. Jasmine's condition improved, and tests on March 7 showed no new bacterial growth or infection in her CSF. Jasmine was discharged home on March 8 with IV antibiotics.

¶4.     Dr. McBride prescribed home health services, IV antibiotics, and weekly lab work for Jasmine upon her return home to Lauderdale County. Sta-Home Health Agency accepted the prescription for home health services and provided nurses to care for Jasmine at home. Dr. McBride also ordered a March 15 follow-up visit for wound care, including the removal of staples from Jasmine's head, and a March 22 follow-up visit for a head CT scan. Due to insurance issues and/or for convenience, Moore and Dr. McBride agreed that Jasmine would see a Mississippi provider for her follow-up visits. On March 16, Dale Higginbotham, N.P., saw Jasmine at Anderson Children's Medical Clinic in Meridian for wound care and removed her staples. Jasmine was not experiencing any apparent medical issues or symptoms of a shunt malfunction or infection at the time. Higginbotham also agreed to facilitate Jasmine's head CT, which occurred on March 23 at Anderson Regional Medical Center (Anderson) in Meridian. Higginbotham testified that she did not review Jasmine's CT results or notify Dr. McBride because Moore told her that she (Moore) would be responsible for picking up the CT results and getting them to Dr. McBride.

¶5.     On March 26, 2016, Jasmine fell and hit her head at home and began vomiting.

3

Moore took her to the Rush emergency department in Meridian, arriving at approximately 2:45 p.m. with complaints of dizziness. Jasmine was seen by Elizabeth Sims, N.P., and Dr. Linus Martin. Dr. Martin noted Jasmine's history of hydrocephalus, her recent shunt revision surgery at CHNO, and her recent CT scan at Anderson. Dr. Martin ordered a repeat CT scan. The radiologist noted "massive hydrocephalus" but "[n]o obvious acute intracranial hemorrhage." The radiologist discussed his findings with Dr. Martin, and Dr. Martin in turn discussed Jasmine's condition with Moore.

¶6.     Moore recalled Dr. Martin saying that Jasmine "did not have any hemorrhaging on her brain, but she did have major hydrocephalus." Moore was not concerned or surprised by this, as she was well aware of Jasmine's hydrocephalus. However, according to Moore, Dr. Martin was "very concerned about the placement of [Jasmine's] shunt tube," so Moore telephoned Dr. McBride, and Dr. Martin spoke directly to Dr. McBride. Moore testified that after Dr. Martin spoke to Dr. McBride, Dr. Martin said something to the effect that Dr. McBride had indicated that Jasmine "was fine." Jasmine was then discharged from Rush (at approximately 5 p.m. on March 26) with specific instructions to "follow up with Dr. McBride in 2-3 days" and "return to the [ER] for new or worsening symptoms."[1] Dr. Martin testified in his deposition that he could not recall the specifics of his conversation with Dr. McBride. However, he testified that he "would have talked to [Jasmine's] neurosurgeon because she recently had a shunt revision and was being treated with antibiotics for [an] infection." Based on his discharge instructions, Dr. Martin assumed that Dr. McBride must have

---

[1] Jasmine's chart noted that she previously had a follow-up appointment scheduled with Dr. McBride in two weeks.

requested that Jasmine follow up with her (Dr. McBride) in 2-3 days.

¶7.    Jasmine did not see Dr. McBride within 2-3 days, as instructed.  Rather, five days later, Moore and Jasmine returned to the Rush emergency department.  A new CT showed an increased buildup of fluid on Jasmine's brain, and Jasmine was immediately transferred to CHNO.  On April 1, Dr. McBride performed a "shunt externalization" to remove fluid and relieve pressure from Jasmine's brain.  Subsequent testing of Jasmine's CSF showed that the Group B streptococcal bacterial infection had returned.  Jasmine was treated at CHNO for approximately eight weeks, during which time she continued to experience fluid buildup, brain swelling and infection, brain stem compression, and progressive neurologic decline.  Jasmine suffered significant brain damage as a result.

¶8.    In December 2016, Moore filed suit on behalf of Jasmine in the United States District Court for the Southern District of Mississippi against (1) Dr. McBride; (2) UMMC; (3) Rush, Dr. Martin, and Sims (collectively, "the Rush defendants"); (4) Sta-Home Health Agency and three of its nurses (collectively, "the Sta-Home defendants"); and (5) Anderson and Higginbotham (collectively, "the Anderson defendants").  The complaint asserted medical malpractice claims against all defendants and claims under the federal Emergency Medical Treatment and Active Labor Act ("EMTALA") against Rush and Anderson.  The district court dismissed all claims against Dr. McBride for lack of personal jurisdiction[2] and later

_____

[2] *Frazier ex rel. J.L.F. v. Univ. of Miss. Med. Ctr.*, No. 3:16-CV-976, 2017 WL 4400009 (S.D. Miss. Oct. 2, 2017).  Moore later submitted her claim against McBride to a Louisiana medical review panel, which is a precondition to filing a medical malpractice lawsuit under Louisiana law.  The record does not show whether Moore obtained an opinion from the panel or filed suit thereafter.  However, at a hearing in the circuit court, Moore's attorney stated that Moore had decided not to pursue a claim against Dr. McBride.

granted summary judgment on the EMTALA claims in favor of Rush and Anderson. The court then declined to exercise supplemental jurisdiction over Moore's state-law claims and dismissed those claims without prejudice. In 2020, Moore filed suit on behalf of Jasmine in the Hinds County Circuit Court, reasserting medical malpractice claims against UMMC, the Rush defendants, the Sta-Home defendants, and the Anderson defendants. The Hinds County Circuit Court severed Moore's claims against the Rush, Sta-Home, and Anderson defendants from her claims against UMMC and transferred all claims against the non-UMMC defendants to the Lauderdale County Circuit Court.

¶9. Moore's complaint alleged that UMMC and its physicians committed malpractice while Jasmine was under their care on February 26-29, 2016, by negligently failing to diagnose a shunt malfunction and ultimately discharging Jasmine "with symptoms of an emergency shunt malfunction." The complaint alleged that the Sta-Home defendants negligently failed to report Jasmine's symptoms and changes in her condition to other healthcare providers and failed to obtain "immediate stabilizing treatment" for Jasmine. The complaint further alleged that Sta-Home violated various laws and regulations and assigned nurses to Jasmine who were not qualified to care for a patient in Jasmine's condition. The complaint alleged that the Anderson defendants negligently failed to diagnose an emergency shunt malfunction, failed to communicate with other healthcare providers, and failed to timely refer Jasmine for emergency treatment. The complaint further alleged that Anderson negligently assigned Jasmine to a nurse practitioner for treatment given Jasmine's medical history and condition. The complaint alleged that the Rush defendants negligently failed to

diagnose a shunt malfunction and infection, stabilize Jasmine, and transfer her to another hospital for emergency medical treatment. The complaint alleged that all the defendants' negligent acts proximately caused Jasmine to sustain permanent and irreparable brain damage and past and future medical expenses.

¶10. Following discovery, the Anderson defendants filed a *Daubert*[3] motion to exclude the testimony of Dr. Kent Taub, a certified emergency medicine physician whom Moore had designated to opine regarding the Anderson defendants' alleged breaches of the standard of care. The Anderson defendants argued that Dr. Taub lacked familiarity with, and was not qualified to opine regarding, the standard of care applicable to a nurse practitioner in a non-emergency pediatric care setting.[4] The Anderson defendants also filed a motion for summary judgment, arguing that Moore could not show a breach of the standard of care (because Dr. Taub's opinions were inadmissible) or that the alleged breach proximately caused any injury to Jasmine under Mississippi's loss-of-chance doctrine. The Anderson defendants also filed a *Daubert* motion to exclude the testimony of Dr. Kimberly Terry, a pediatric neurosurgeon designated by Moore to provide expert testimony regarding Jasmine's care, breaches of the standard of care, and causation issues. The Anderson defendants argued that Dr. Terry's testimony regarding causation was unreliable and inconsistent with Mississippi's loss-of-

---

[3] *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35-40 (¶¶5-25) (Miss. 2003) (adopting the rule stated in *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993), as modified in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), as the standard for the admissibility of expert testimony).

[4] The Anderson defendants later filed a motion to strike additional opinions Dr. Taub offered, arguing that Dr. Taub offered new and previously undisclosed opinions in response to the Anderson defendants' summary judgment motion. The court granted that motion.

chance doctrine. Finally, the Anderson defendants filed a supplemental motion for summary judgment in which they argued that Higginbotham undertook only narrowly limited duties to remove staples from Jasmine's head and facilitate a head CT scan. The Anderson defendants argued that they were entitled to summary judgment because Higginbotham fulfilled any legal duty she undertook.

¶11. The Sta-Home defendants moved for summary judgment, arguing that Moore's negligence per se claims based on alleged violations of laws and regulations were wrong as a matter of law and that there was no causal connection between the alleged violations and Jasmine's injuries. The Sta-Home defendants also argued that Moore could not show a breach of the standard of care by any of their nurses or that any alleged breach proximately caused Jasmine's injuries under Mississippi's loss-of-chance doctrine.

¶12. The Rush defendants moved for summary judgment, arguing, inter alia, that Moore could not establish causation under Mississippi's loss-of-chance doctrine. The Rush defendants also filed a *Daubert* motion to limit or exclude the testimony of Dr. Taub, arguing, inter alia, that Dr. Taub was not qualified to offer opinions related to neurology, radiology, shunt infections, or proximate causation and that Dr. Taub's opinions regarding alleged breaches by Rush were vague and unreliable.

¶13. Moore responded to the defendants' *Daubert* motions and summary judgment motions, and the court held hearings on the motions.

¶14. The circuit court denied the Anderson defendants' *Daubert* motion to exclude Dr. Taub's testimony and granted in part and denied in part the Rush defendants' *Daubert* motion

to exclude Dr. Taub's testimony. The court also denied the Anderson defendants' *Daubert* motion to exclude Dr. Terry's causation opinions.[5]

¶15. The court granted the Anderson defendants' supplemental motion for summary judgment, concluding that Higginbotham "did not owe a legal duty to [Jasmine] to interpret [her] CT findings for treatment of her underlying hydrocephalus or otherwise engage in any follow-up . . . neurological care." The court ruled that the Anderson defendants were entitled to summary judgment because the undisputed material facts showed that Higginbotham fulfilled the limited duties she undertook to provide wound care and facilitate a head CT scan. Because the court granted the Anderson defendants' supplemental motion for summary judgment, it denied their original motion as moot.

¶16. The court granted the Sta-Home defendants' motion for summary judgment, finding that there was no evidence that Sta-Home violated applicable laws or regulations and no evidence of any causal connection between the alleged violations and Jasmine's injuries. The court further concluded that there were no genuine issues of fact and that Moore could not show any breach of the standard of care by any of the Sta-Home nurses or that any alleged breach proximately caused Jasmine's injuries.

¶17. The court denied the Rush defendants' summary judgment motion, finding that there were genuine issues of material fact. The Rush defendants filed a motion to reconsider, again arguing that Moore failed to create a genuine issue of material fact on the issue of causation. The Rush defendants argued that Moore could not show that Dr. McBride would

---

[5] The Anderson defendants filed motions to reconsider the court's orders denying their *Daubert* motions. The court denied those motions.

9

have done anything differently if Dr. Martin had provided her some unspecified different or additional information during their phone conversation on March 26, 2016. The court granted the motion for reconsideration and granted summary judgment in favor of the Rush defendants. The court concluded, as urged in the motion, that Moore had presented "no evidence that Dr. McBride would have undertaken immediate surgical intervention" if Dr. Martin had provided her with additional information on March 26, 2016.

¶18. Having granted summary judgment in favor of all the defendants, the circuit court entered a final judgment of dismissal as to all of Moore's claims. Moore filed a notice of appeal as to all defendants. The defendants cross-appealed the circuit court's orders denying their *Daubert* motions. The Sta-Home defendants also cross-appealed the denial (as moot) of their original summary judgment motion.[6]

## ANALYSIS

¶19. We review an order granting summary judgment de novo, viewing the evidence in the light most favorable to the non-movant. *Karpinsky v. Am. Nat'l Ins.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013). Summary judgment "shall" be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). Indeed, "the court *must* grant summary judgment unless . . . the record demonstrates at least the minimum quantum of evidence sufficient to

---

[6] Jasmine passed away during this appeal. Moore filed a motion to be substituted as the plaintiff-appellant in her capacity as the administratrix of Jasmine's estate. Moore's motion was granted.

10

justify a determination in favor of the [non-movant] by a reasonable juror." *Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1274 (¶19) (Miss. 2007). "When the plaintiff, as in this case, bears the burden of proof at trial, a defendant may elect to move for summary judgment by identifying deficiencies in the plaintiff's evidence." *Carter v. C&S Canopy Inc.*, 381 So. 3d 399, 403 (¶9) (Miss. Ct. App. 2024) (quoting *Maxwell v. Baptist Mem'l Hosp.-DeSoto Inc.*, 15 So. 3d 427, 433 (¶15) (Miss. Ct. App. 2008)).

¶20. In the circuit court, each defendant moved for summary judgment on multiple grounds, some of which the circuit court adopted in its orders granting the defendants' motions. On appeal, we review an order granting summary judgment de novo, and "[o]ur review is not limited to the specific grounds on which the circuit court granted summary judgment. Rather, we review the record de novo and may consider any grounds that the moving party raised in the circuit court." *Keckley v. Estes Equip. Co.*, 276 So. 3d 1230, 1235 (¶14) (Miss. Ct. App. 2018) (citing *Brocato v. Miss. Publishers Corp.*, 503 So. 2d 241, 244 (Miss. 1987); *Stroud v. Progressive Gulf Ins.*, 239 So. 3d 516, 526 (¶31) (Miss. Ct. App. 2017)). Indeed, "we *must* affirm the grant of summary judgment if any ground raised and argued below will support the lower court's decision." *Horton ex rel. Est. of Erves v. City of Vicksburg*, 268 So. 3d 504, 507 (¶8) (Miss. 2018) (emphasis added) (brackets and quotation marks omitted); *see also, e.g.*, *Jennings v. Shuler*, 147 So. 3d 847, 849 (¶3) (Miss. Ct. App. 2014) ("[I]n our de novo review, we must consider each ground for summary judgment raised by [the defendant-appellee]."). For the reasons explained below, we conclude that the defendants are all entitled to judgment as a matter of law due to a lack of

evidence to show causation. Therefore, we need not address the additional issues raised by the defendants or decided by the circuit court.

¶21. "To establish a prima facie case of medical malpractice under Mississippi law, a plaintiff must prove by a preponderance of the evidence (1) the applicable standard of care; (2) a failure to conform to the required standard; and (3) an injury proximately caused by a defendant's noncompliance with the standard." *Norman v. Anderson Reg'l Med. Ctr.*, 262 So. 3d 520, 523 (¶12) (Miss. 2019). "The nonmoving party generally must establish medical negligence through expert testimony. Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *United Emergency Servs. of Miss. Inc. v. Miller ex rel. Reed*, 414 So. 3d 66, 71 (¶9) (Miss. 2025) (citations and quotation marks omitted).

¶22. A plaintiff may establish causation under a "loss of chance" theory. *Mem'l Hosp. at Gulfport v. White*, 170 So. 3d 506, 508 (¶11) (Miss. 2015). "To recover under this theory, the plaintiff must prove that, but for the physician's negligence, [the patient] had a reasonable probability of a substantial improvement." *Id.* (footnote omitted). "A plaintiff cannot recover by showing a mere possibility of a chance of recovery." *Id.* (quotation marks omitted). Rather, "the plaintiff must offer proof of a greater than fifty (50) percent chance of a better result than was in fact obtained." *Id.* at 509 (quotation marks omitted).

¶23. The Mississippi Supreme Court applied this rule in *Mississippi Baptist Health Systems Inc. v. Harris*, 320 So. 3d 484 (Miss. 2021). There, the plaintiff's expert opined that the

defendant's nurses breached the standard of care by failing to notify the treating physician (Dr. Dawson) of the patient's continuing pain before the patient was discharged from the hospital. *Id.* at 488 (¶17). However, Dr. Dawson had already "diagnosed [the patient's] pain as orthopedic rather than cardiovascular," "ordered [him] a pain injection," "approved [his] discharge," and "order[ed] him outpatient medication, knowing his pain would likely continue." *Id.* at (¶19). The Supreme Court held that the plaintiff could not establish causation because there was no evidence that if the nurses had notified Dr. Dawson of the patient's continuing pain, then Dr. Dawson would have "changed his mind," reversed his prior orders, and ordered additional tests or a different course of treatment. *Id.* at 488-89 (¶¶21-25). The Court stated, "No proof was presented that Dr. Dawson would have changed his mind." *Id.* at 489 (¶25). Therefore, the Court held that the expert's opinion on causation was "mere speculation" and insufficient to withstand summary judgment. *Id.* at 488-89 (¶¶20-26).

¶24. In *United Emergency Services of Mississippi Inc. v. Miller ex rel. Reed*, 414 So. 3d 66 (Miss. 2025), the plaintiff's expert opined that an emergency room (ER) doctor should have admitted the patient to the hospital for additional monitoring and treatment due to the risk of a major cardiac event. *Id.* at 73 (¶15). However, the defendant hospital showed that a cardiologist's approval was necessary to admit the patient, and neither the on-call cardiologist nor the backup on-call cardiologist would have admitted the patient even if they had been informed of his condition. *Id.* at 70, 73 (¶¶6, 16). For that reason, the Supreme Court held that the plaintiff could not meet her burden of proving that the ER doctor's

13

"alleged negligence was a cause in fact of [the patient's] death." *Id.* at 73 (¶16). Therefore, the hospital was entitled to summary judgment on that claim. *Id.* at 76 (¶30).

¶25.    The causation issue in this case is similar. As discussed above, Jasmine presented to the Rush emergency department at approximately 2:45 p.m. on March 26, 2016. She was seen by Sims and Dr. Martin. Dr. Martin ordered a CT scan of Jasmine's brain. The radiologist noted "massive hydrocephalus" with "[n]o obvious acute intracranial hemorrhage." The radiologist discussed his findings with Dr. Martin, and Dr. Martin in turn discussed them with Moore.

¶26.    Moore testified that she was not surprised when Dr. Martin told her Jasmine had "major hydrocephalus." However, Moore testified that Dr. Martin was "very concerned about the placement of [Jasmine's] shunt tube," so Moore telephoned Jasmine's *treating pediatric neurosurgeon*, Dr. McBride, and Dr. Martin spoke directly to Dr. McBride. According to Moore, after Dr. Martin spoke to Dr. McBride, he said something to the effect that Dr. McBride had said Jasmine "was fine." Jasmine was then discharged from Rush (at approximately 5 p.m. on March 26) with specific instructions to "follow up with Dr. McBride in 2-3 days" and "return to the [ER] for new or worsening symptoms." Dr. Martin testified in his deposition that he could not recall the specifics of his conversation with Dr. McBride on March 26. However, he testified that he "would have talked to [Jasmine's] neurosurgeon because she recently had a shunt revision and was being treated with antibiotics for [an] infection." Based on his discharge instructions, Dr. Martin testified that he assumed that Dr. McBride requested that Jasmine follow up with her (Dr. McBride) in 2-3 days.

14

¶27.  Unfortunately, Jasmine did not see Dr. McBride within 2-3 days, as instructed. Rather, five days later, Moore and Jasmine returned to the Rush emergency department. Another CT scan was performed, which showed that Jasmine's condition had worsened, and Jasmine was immediately transferred to CHNO for treatment.

¶28.  Moore's theory of liability as to Dr. Martin and Rush is that Dr. Martin negligently failed to tell Dr. McBride about the results of the March 26 CT scan or some other information about Jasmine's condition on that day.  Moore claims that Jasmine would have had a substantially better outcome if she had been transferred to CHNO on March 26 and Dr. McBride had removed the infected shunt immediately.  That being Moore's theory, Moore necessarily bears a burden of proving that Dr. McBride would have ordered Jasmine's immediate transfer to CHNO if Dr. Martin had provided some additional information on March 26.

¶29.  As in *Mississippi Baptist Health Systems* and *United Emergency Services*, Moore has not produced any evidence that Dr. McBride would have done anything differently if Dr. Martin had conveyed some specific information on March 26.  Rather, the record shows that on March 26, Dr. Martin *did* speak directly with Dr. McBride—who, again, is a pediatric neurosurgeon with subject matter expertise far greater than Dr. Martin, an emergency medicine physician.  Dr. Martin discussed Jasmine's condition with Dr. McBride, although there is no evidence of the specifics of their discussion.  Following that conversation, Dr. McBride did *not* direct Dr. Martin to transfer Jasmine to CHNO.  Rather, after talking to Dr. McBride, Dr. Martin discharged Jasmine with instructions to see Dr. McBride within 2-3

15

days. Moore presented no proof that any action by Dr. Martin on March 26 would have caused Dr. McBride to order Jasmine's immediate transfer to CHNO. Therefore, under our Supreme Court's decisions in *Mississippi Baptist Health Systems* and *United Emergency Services*, there is insufficient evidence that Dr. Martin's alleged negligence was a cause in fact of any subsequent deterioration in Jasmine's condition.

¶30. The dissent indicates that Moore is not required to show what *Dr. McBride* would have done if she had been notified of some additional information on March 26. The dissent concludes that it is sufficient for Moore to show that a hypothetical doctor following the "national standard of care" would have ordered Jasmine's immediate transfer on March 26.[7] However, Jasmine was not under the care of a hypothetical physician on March 26—she was under the care of her treating pediatric neurosurgeon, Dr. McBride. Therefore, for purposes of causation, the relevant question is what *Dr. McBride* would have done if provided with whatever information Dr. Martin allegedly failed to convey. In *Mississippi Baptist Health Systems*, the Supreme Court held that the plaintiff's claim failed because "[n]o proof was presented that *Dr. Dawson*," the treating physician, "would have changed his mind" if the defendant's nurses had given him additional information. *Miss. Baptist Health Sys.*, 320 So. 3d at 489 (¶25) (emphasis added). And in *United Emergency Services*, the plaintiff's claim failed because he presented no evidence that "the *on-call cardiologists*" would have admitted the patient if the defendant ER doctor had consulted them. *United Emergency Servs.*, 414

---

[7] Plaintiff's expert, Dr. Terry, testified that "a pediatric surgeon acting within the standard of care would have taken action" based on the results of the March 23 CT scan. However, Dr. Terry acknowledged, "I can't speak for Dr. McBride."

16

So. 3d at 73 (¶16) (emphasis added). Likewise, in this case, Moore's claim fails because she offered no evidence that *Dr. McBride* would have ordered Jasmine's immediate transfer if Dr. Martin had given her some additional information.

¶31. For similar reasons, Moore's claims against the Anderson defendants and the Sta-Home defendants also fail. Those claims allege that Dr. McBride would have performed surgery or provided some other treatment sooner if Anderson or Sta-Home had provided Dr. McBride with some additional information regarding Jasmine's condition. However, as with Moore's claims against Dr. Martin, there is no evidence to show what Dr. McBride would have done and, hence, no proof of causation.

¶32. To say that Moore failed to meet her burden of proving causation in this case does not, as the dissent seems to suggest, abandon the principle that "doctors are held to a national standard of care." For any claims properly brought against Dr. McBride under Mississippi law, Dr. McBride *would* be held to "the national standard of care." *But this case does not involve any claims against Dr. McBride.* The issue in this case is whether Moore can meet her burden of proving that any alleged negligence *by the defendants in this case* proximately caused any injury to Jasmine. For all the claims asserted in this case, the issue of causation necessarily depends on proof of what *Dr. McBride* would have done in response to any additional information these defendants allegedly should have provided. The record is silent as to what Dr. McBride would have done, and the burden of producing evidence sufficient to establish causation rests on the plaintiff, not the defendants. *E.g.*, *Johnson v. Pace*, 122 So. 3d 66, 68 (¶8) (Miss. 2013). Because Moore failed to meet that burden, the defendants

17

were entitled to judgment as a matter of law.  Therefore, the circuit court did not err by granting the defendants' motions for summary judgment.[8]

¶33.     **ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED.**

     **CARLTON, P.J., EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.  WESTBROOKS AND McDONALD, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, McDONALD AND McCARTY, JJ.  BARNES, C.J., NOT PARTICIPATING.**

     **LAWRENCE, J., DISSENTING:**

¶34.     The majority affirms the summary judgment dismissing Moore's medical malpractice claims because Dr. McBride, Jasmine's treating neurosurgeon, never personally opined that the healthcare providers breached the standard of care and proximately caused Jasmine not to have a chance at a better recovery.  In so doing, the majority relies on an interpretation of several supreme court medical malpractice cases affirming summary judgment under the "lost chance of recovery" theory.  I believe that the majority's narrow interpretation of those cases produces unjust and impossible evidentiary burdens on litigants and alters the national standard-of-care landscape of medical malpractice law.  Further, even if the majority is correct and the supreme court intended the legal effect assigned by the majority, Moore's experts rendered opinions directly on the proximate cause issue that should have precluded summary judgment on lost chance of recovery.  Finally, assuming, again for purposes of argument only, that the majority is correct on some claims, I disagree with the dismissal of Moore's other claims not dependent on the lost-chance-of-recovery doctrine or Dr.

_____

     [8] Because we affirm the grant of summary judgment on the issue of causation, we do not address the additional grounds raised by the various defendants.

18

McBride's testimony, as clear genuine issues of material fact existed on those other claims. Accordingly, I respectfully dissent.

¶35.   As established, all three groups of defendants argue the theory of lost chance of recovery.  Under the lost-chance-of-recovery doctrine, a "plaintiff must prove that, but for the physician's negligence, he or she had a reasonable probability of a substantial improvement."  *United Emergency Servs. of Miss. v. Miller*, 414 So. 3d 66, 75 (¶10) (Miss. 2025) (internal quotations omitted) (quoting *Mem'l Hosp. at Gulfport v. White*, 170 So. 3d 506, 508 (¶11) (Miss. 2015)).  Put simply, the plaintiff "must prove a greater than 50 percent chance of a substantially better outcome[.]"  *Norman v. Anderson Reg. Med. Ctr.*, 262 So. 3d 520, 523 (¶10) (Miss. 2019).  According to the majority and the healthcare providers' arguments, the testimony of one particular practicing neurosurgeon—here, Dr. McBride—regarding what she would have done but for the alleged negligence is the only avenue for a plaintiff to show that a "substantially better outcome" would have occurred. The majority's conclusion rests on three recent decisions from the Mississippi Supreme Court.[9]

¶36.   In *Smith v. Hardy Wilson Mem'l Hosp.*, 300 So. 3d 991 (Miss. 2020), the Smiths filed suit against Hardy Wilson Memorial Hospital alleging in part that the hospital's negligence, by and through its nursing staff, caused or contributed to Smith's death.  *Id.* at 994 (¶6).  The

---

[9]  The majority discusses only two of the three cases, *Mississippi Baptist Health Systems Inc. v. Harris*, 320 So. 3d 484 (Miss. 2021), and *United Emergency Services of Mississippi Inc. v. Miller*, 414 So. 3d 66 (Miss. 2025), and does not mention the first case, *Smith v. Hardy Wilson Mem'l Hosp.*, 300 So. 3d 991 (Miss. 2020), upon which the other two rely.

19

claim was based on the care Smith received after she sought treatment at the hospital from falling outside her home. *Id.* at 992 (¶2). She was treated by Dr. James Johnson who gave her Dilaudid for her pain, ordered an X-Ray and a CT scan of her shoulder. *Id.* at (¶3). Dr. Johnson then decided to discharge Smith. *Id.* Smith's vital signs began to worsen, but Dr. Johnson proceeded with his decision to discharge Smith. *Id.* at (¶5). As Smith was leaving, her husband heard one of the nurses comment that she did not agree with the decision to discharge Smith. *Id.* Smith died later that evening. *Id.*

¶37. The hospital moved for summary judgment, arguing that the Smiths failed to provide expert testimony that the nursing staff was negligent. *Id.* at 994 (¶7). In response, the Smiths submitted affidavits from two doctors, Dr. Dale and Dr. Stodard, both of whom opined that "[t]o a reasonable degree of medical probability, but for the discharge by Dr. Johnson of Carolyn Smith with depressed respiratory function and altered mental state, Carolyn Smith would not have died." *Id.* at 995 (¶9). The experts also opined that "Dr. Johnson breached the applicable standards of care in his treatment of Carolyn Smith by discharging her with the vital signs which were taken and recorded at the time of discharge per the records." *Id.*

¶38. The Smiths also submitted an affidavit from "[a] nursing care expert, Irish Patrick-Williams, R.N." *Id.* at 994 (¶8). He opined that the nurses had breached the standard of care, which "required the nursing staff to take 'affirmative action for Carolyn Smith to be kept in the emergency room . . . despite physician[s'] orders' or to 's[eek] supervisory authority and/or consultation from other physicians, such as a physician on-call.'" *Id.* at 997 (¶18) (alterations in original).

20

¶39.	The trial court found that Nurse Irish Patrick-Williams's affidavit could not be relied upon to establish the causation element of the Smiths' claim because, under Mississippi law, "nurses are prohibited from giving medical causation opinions[.]" *Id.* at 997 (¶10). The trial court subsequently granted the hospital's motion for summary judgment, finding that

> no competent evidence has been produced on the causation element of [the Smiths'] claims against [Hardy Wilson's] nursing staff, and [the Smiths] cannot prove Carolyn Smith's injuries or death was [sic] caused by any alleged negligence of the nursing staff.

*Id.* at 995-96 (¶10) (alterations in original).

¶40.	On appeal, the Mississippi Supreme Court affirmed the grant of summary judgment and stated, "In this medical-malpractice action, the Smiths, as the plaintiffs, bore the burden of producing 'significant and probative' evidence establishing each element of their claim to sufficiently rebut [the hospital]'s motion for summary judgment." *Id.* at 997 (¶16) (citing *Palmer v. Biloxi Reg'l Med. Ctr. Inc.*, 564 So. 2d 1346, 1355 (Miss. 1990)). The supreme court found that Nurse Patrick-Williams's affidavit was based on speculation because there was no proof that "if the nurses had objected to Carolyn's discharge, had sought administrative assistance or had sought assistance from another doctor, then Carolyn would not have been discharged." There was no proof that there was an "on-call physician" or another administrator with authority to overrule the doctor. Additionally, the supreme court held that "the record contain[ed] no proof that Dr. Johnson would have changed his mind when faced with opposition from the nurses." *Id.* at (¶21). Neither of the expert doctor affidavits put forth by the Smiths "aver that persistence by the nurses *after* Dr. Johnson's final decision to discharge would have resulted in a different decision." *Id.* (italics in

21

original).

¶41. I find *Smith*'s holding refutes the majority's finding that only Dr. McBride could provide the proximate cause finding in this case. The court in *Smith* left open the door for future medical malpractice litigants to survive summary judgment when expert testimony is provided on the issue of proximate cause. *Id.* at 998 (¶3). The supreme court specifically stated, "To be sure, the Smiths' physician experts opine that Dr. Johnson violated the standard of care by discharging Carolyn. But **neither Dr. Dale nor Dr. Stodard aver** that persistence by the nurses after Dr. Johnson's final decision to discharge would have resulted in a different decision." *Id.* The court never said that only the treating physician could provide the missing proof. On the contrary, the court stated the plaintiff's expert failed to state the missing proof. *Smith* is the cornerstone case by the supreme court that blossomed into the two pivotal cases that the majority relies upon to affirm the grant of summary judgment in this case – *Mississippi Baptist Health Systems Inc. v. Harris*, 320 So. 3d 484 (Miss. 2021), and *United Emergency Services of Mississippi Inc. v. Miller*, 414 So. 3d 66 (Miss. 2025).

¶42. In *Harris*, Roosevelt Ard went to the emergency room at Mississippi Baptist Medical Center (MBMC) because he was experiencing chest pain and leg numbness after a previous outpatient cardiac stress test. *Harris*, 320 So. 3d at 486 (¶3). While at MBMC, Dr. William Dawson treated Ard and ordered Dilaudid for Ard's pain. *Id.* at 486 (¶6). Dr. Dawson also ordered an X-ray, and an EKG, which both came back "normal." *Id.* Dr. Dawson diagnosed Ard with "acute back strain" and discharged him. *Id.* Eight hours after being discharged,

22

Ard was unresponsive and rushed to the University of Mississippi Medical Center's emergency department, where he was pronounced dead. *Id.* at 486 (¶7).

¶43. Ard's wrongful death beneficiaries filed a complaint alleging that MBMC[10] was "vicariously liable for the medical care rendered by Dr. Dawson" and "for the allegedly negligent care provided by its nursing employees in the emergency department." *Id.* at (¶9). The plaintiffs submitted a medical expert affidavit by Dr. Daniel Abbott that opined that the nursing staff breached the standard of care by failing to "reevaluate Ard after his injection shot or at the time of discharge." The expert opined that

> the nurse(s) should have notified the EDMD of the ongoing pain and asked for further evaluation of the patient before discharging him. Because Ard was hemodynamically stable in the ED and because he lived into the night on January 13, 2016, it is more likely than not[] that had the emergency surgery been done, he would have survived.

*Id.* at 488 (¶17).

¶44. The case was appealed by MBMC after its motion for summary judgment on the issues of vicarious liability against Dr. Dawson and negligence of the nursing staff was denied. The supreme court stated that "[a]t most, Dr. Abbott's affidavit implied that had the nurses notified Dr. Dawson [that the patient] was still in pain and further evaluated him, then maybe Dr. Dawson would have changed his mind, discovered that the source of [his continued] pain was not orthopedic, ordered a CT scan, discovered the dissection, and ordered emergency surgery." *Id.* at 489 (¶25). The court found, however, that "[n]o proof was presented that Dr. Dawson would have changed his mind[,]" so the plaintiffs failed to

---

[10] There were other entities involved in this suit but, for the purposes of this opinion, we will not delve into those details.

23

establish causation as to the nursing staff at MBMC. *Id.* Again, the supreme court never said that the treating physician was the only doctor qualified to render an opinion on the missing proof. The court specifically took issue with the plaintiff's medical expert failing to provide the missing proof.

¶45. Lastly, in *Miller*, Oliver Miller filed suit against a hospital, emergency room services, and Dr. Keith McCoy after the death of his son, Shannon Reed. *Miller*, 414 So. 3d at 70 (¶5). Miller alleged that "Reed's death was proximately caused by the defendant's failures to properly monitor, diagnose, treat and discharge Reed." *Id.* Part of Miller's claim of medical malpractice centered on the failure to admit Reed to the hospital on the night that he received treatment in the emergency room. *Id.* Reed died "during the night following his discharge." *Id.* at (¶4). The trial court denied the hospital, emergency room services, and Dr. McCoy's motions for summary judgment, and the defendants subsequently filed for interlocutory appeal, which was granted. *Id.* at 71 (¶8).

¶46. On interlocutory appeal, the supreme court found that a doctor's affidavit stated that Reed "'was at high risk for a major cardiac event or other major illness' and that Dr. McCoy should have admitted Reed to the hospital." *Id*. at 73 (¶15). Dr. McCoy, however, did not have admitting privilege into the hospital, and "would have needed to consult the on-call cardiologist to admit Reed." *Id.* at 73 (¶16). The on-call cardiologist in *Miller* and another cardiologist submitted affidavits that even if they had been consulted by Dr. McCoy, they would not have admitted Reed to the hospital that night. *Id.* The court relied on *Smith* and *Harris* to find that Harris's claims against Dr. McCoy on his failure to admit Reed to the

hospital "failed to meet the causation element by showing that the on-call cardiologist would have admitted Reed into the hospital." *Id.* The supreme court granted summary judgment against Miller on that specific claim under the lost-chance-of-recovery doctrine but affirmed the denial of summary judgment on all of Harris's other claims. *Id.* at 73 (¶17). The supreme court remanded the case back to the trial court for trial on the remaining issues.

¶47. Each of the above cases leaves open the possibility for a medical expert to state what a reasonably prudent doctor *should* have done. *Smith*, 300 So. 3d at 998 (¶3) (neither expert avers that persistence by the nurses would have changed the doctor's mind); *Miller*, 414 So. 3d at 72-73 (¶¶14-16) (showing a lack of evidence from the plaintiff on what a reasonably prudent cardiologist would have done); *Harris*, 320 So 3d at 489 (¶25) ("No proof was presented that Dr. Dawson would have changed his mind."). Indeed, every neurosurgeon in the country is required to abide by and act in accordance with a national standard of care.[11] Under the law, Dr. McBride would have been required to follow this national standard of care and act as a reasonably prudent neurosurgeon would when provided any information by any other healthcare provider during March 2016. The majority's interpretation of those cases requiring Dr. McBride and only Dr. McBride to testify does severe harm to the national standard of care. Instead of Jasmine being required to be treated according to the national standard of care, i.e, what a reasonable prudent neurosurgeon would have done, according

---

[11] Collin J. Larkin et al., *Overview of Medical Malpractice in Neurosurgery*, 49 Journal of Neurosurgery E2 (Nov. 2020), https://thejns.org/focus/view/journals/neurosurg-focus/49/5/article-pE2.xml ("Accordingly, physicians are held to the same standard of care as other physicians within the same specialty. . . . [S]tandard of care is measured by what a reasonably prudent person would do, rather than subjective preferences.").

to the majority, she was relegated to the subjective standard of care, i.e, what would Dr. McBride have done. The majority applies a subjective standard of care despite clear precedence that every act of Dr. McBride and the 8,000 other board certified neurosurgeons[12] in this country are required to abide by a national standard of care. *See Est. of Northrop v. Hutto*, 9 So. 3d 381, 384 (¶9) (Miss. 2009) ("A physician is under a duty to meet the national standard of care.").[13]

¶48. I find it inconceivable that the Mississippi Supreme Court would alter such a foundational principle of tort law—that doctors are held to a national standard of care in the treatment of their patients—without expressly and explicitly stating so. Such a turn would create legal burdens for plaintiffs that could be potentially impossible to overcome. There are approximately 8,000 board-certified neurosurgeons in the United States who could render a viable opinion as to the standard of care and whether that standard was breached. The majority's holding that only one of those neurosurgeons, Dr. McBride, as the treating

---

[12] The Court of Appeals "applies a de novo standard of review to a grant of summary judgment by the trial court." *Leffler v. Sharp*, 891 So. 2d 152, 156 (¶9) (Miss. 2004). "That is to say, we completely review the grant of summary judgment anew, or afresh, without deference to the trial court's ruling." *Stuart v. St. Dominic-Jackson Mem'l. Hosp.*, 311 So. 3d 1192, 1202 (¶47) (Miss. Ct. App. 2020).

[13] *Hutto* continues to explain:

[G]iven the circumstances of each patient, each physician has a duty to . . . treat . . . each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States[.]

*Hutto*, 9 So. 3d at 384 (¶9) (quoting *Palmer v. Biloxi Reg'l Med. Ctr.*, 564 So. 2d 1346, 1355 (Miss. 1990)).

neurosurgeon, was competent to testify appears to overlook the national standard of care entirely. Further, following the majority's rationale, a treating doctor could simply refuse to testify or, in a worst-case scenario, offer deceptive or untrue testimony, which would bar an injured party from ever proving proximate cause through another legally qualified neurosurgeon.

¶49. I believe that under our law, Dr. Terry, a board-certified neurosurgeon,[14] and Dr. Kent Taub, a board-certified emergency physician, were certainly qualified to address the proximate cause issue and, in fact, did so, which should have precluded summary judgment.

Dr. Terry stated:

> If the Rush defendants had reported, properly assessed, diagnosed, monitored and treated [Jasmine] as outlined above within a reasonable degree of medical certainty **she would have been more timely treated** for the ventricular shunt infection **without the further brain damage caused by the further delayed** diagnosis.

As for the Sta-Home defendants, Dr. Terry stated:

> If [the] Sta-Home Health defendants had reported the abnormal lab results, clinical symptoms mentioned above, and CT results of 3/23/16 to Dr. McBride or an appropriate physician, within a reasonable degree of medical certainty she would have been, in a timely fashion, treated for the ventricular shunt infection and this would have lessened the degree of brain damage caused by the infection.

¶50. Moore's attached report from Dr. Taub stated:

---

[14] The American Board of Neurological Surgery (ABNS) board-certification "is the highest level of neurosurgical qualification in this country." Sierra Neurosurgery Group, Board Certified, https://www.sierraneurosurgery.com/board-certified (last visited Mar. 24, 2026). "Board certification represents the gold standard that promotes and recognizes excellence, not minimum standards[.]" The American Board of Neurological Surgery, Governance, Codes of Ethics and Conduct, https://www.abns.org/content/governance-codes-of-ethics-and-conduct (last visited Mar. 24, 2026).

> **It was Ms. Higginbotham's duty, under EMTALA**, to act on this abnormal CT finding as soon as it was received, and refer her to a[] neurosurgeon or at least an Emergency Department for further evaluation. . . . [T]he above **actions and inactions** of Ms. Higginbotham of the Anderson Regional Medical Center . . . **are the proximate cause** of the acute worsening of the neurologic and mental status as well as the continued disability and [total] care of [Jasmine].

(Emphasis added).

¶51. This is a key distinction of previous cases from the supreme court and the one before this Court now. The plaintiffs' experts in *Smith*, *Harris*, and *Miller* did not offer the missing proximate cause proof the supreme court found fatally missing. Here, that proof was offered as shown in the excerpts from Dr. Terry and Dr. Taub listed above. Further, Dr. Terry even went so far as to address whether McBride would have acted according to the dictates of the national standard of care. Dr. Terry stated:

> Q: Is it your opinion that if Dr. McBride had seen the 3-23 scan, she would have taken action?
>
> A: I can't speak for Dr. McBride.
>
> Q: Do you have an opinion, **to a reasonable degree of medical probability**, as to whether a pediatric neurosurgeon **acting within the standard of care** would have taken action had the 3-23 scan been seen?
>
> A: I think, with the – with edema and the left basal ganglia and the increased fourth ventricle, **yes.**

(Emphasis added). Here, I believe Dr. Terry and Dr. Taub provided the proximate cause proof necessary to survive summary judgment, and the ultimate issue should have been resolved by a jury. "Generally, questions of proximate cause and negligence are for the jury to determine under proper instructions of the court as to the applicable principles of law

28

involved." *Miller v. Vicksburg Masonic Temple*, 288 So. 3d 372, 376 (¶18) (Miss. Ct. App. 2019) (quoting *Hankins Lumber Co. v. Moore*, 774 So. 2d 459, 464 (¶11) (Miss. Ct. App. 2000)).

¶52.    Further, for purposes of argument only, assuming that the majority is correct and certain claims should be dismissed due to a lack of testimony from Dr. McBride, there were other causes of action asserted by Moore and supported by her medical experts that do not require Dr. McBride's testimony and should not have been dismissed.  As stated in the majority opinion, Moore alleged that the Rush defendants provided Jasmine inadequate care by failing to "diagnose a shunt infection," failing to "stabilize Jasmine," and "transfer[ring] her to another hospital for emergency medical treatment."  Moore alleged the Anderson defendants breached their duty by failing to "diagnose an emergency shunt malfunction" and failing to "communicate with other health care providers" and referring Jasmine for "emergency treatment. Finally, Moore alleged that the Sta-Home defendants breached their duties by failing to adhere to the applicable standards of care for in-home nursing care by failing to "report" Jasmine's condition and symptoms and "violated various laws and regulations and assigned nurses to Jasmine who were not qualified to care for a patient" in her condition.  Clearly, not all of those claims hinge upon the actions or testimony of Dr. McBride.

¶53.    The case most relied on by the majority, *United Emergency Services of Mississippi Inc. v. Miller*, 414 So. 3d 66 (Miss. 2025), stands for the very proposition espoused in this part of the dissent.  If some claims lack proof under the lost-chance-of-recovery theory and

29

are dismissed, that does not mean that other claims not dependent on that missing proof should also be dismissed. The *Miller* Court specifically remanded some causes and claims to the trial court for trial. Those claims included "(1) observation, monitoring, and intervention, (2) Reed's past medical history, (3) interpreting the EKGs, (4) conducting the Troponin tests, (5) reporting Reed's pain increase, and (6) the timeliness and instruction concerning Reed's discharge." Here, allegations by Moore and supported by her medical experts claimed improper monitoring by nurses, improper intervention in failure to diagnose, failure to interpret the emergent condition before them, and failure to render Jasmine for emergency care instead of discharging home. Those claims have nothing to do with Dr. McBride and everything to do with what a reasonable prudent nurse should have done, what a reasonable prudent emergency room doctor should have done, and what a reasonable prudent nurse practitioner should have done.

¶54. It is true, Moore "**may not rest upon mere allegations** or denials in the pleadings but must **set forth specific facts showing that there are genuine issues for trial**." *Id.* (emphasis added). I believe that Moore's case was not built on "mere allegations[.]" Moore set forth "specific facts" in the pleadings and exhibits, including opinions from a variety of certified medical experts that raised concern over the way Jasmine was treated. This Court will review the facts presented "in the light most favorable to the non-moving party[,]" Moore. *Id.* (citing *Robinson v. Singing River Hosp. Sys.*, 732 So. 2d 204, 207 (Miss. 1999)).

¶55. Moore attached to her response to summary judgment the report of Dr. Kimberly Terry, a board-certified neurosurgeon. Dr. Terry had been practicing for more than fifte

years, was licensed in multiple states, and was currently serving as the Chief of Pediatric Neurosurgery at a San Antonio, Texas hospital. Dr. Terry stated in her report:

> On March 26, [2016] Rush discharged [Jasmine] home **despite symptoms which a reasonably prudent, minimally competent physician would have recognized** are **likely to deteriorate** and **cause serious bodily harm**. If Rush acted appropriately and did not **breach the relevant standard of care** on March 26th, as opined by Dr. Kent Taub, it **would have resulted in a substantially better outcome** for [Jasmine].

(Emphasis added). Further,

> If the Rush defendants had reported, properly assessed, diagnosed, monitored and treated [Jasmine] as outlined above within a reasonable degree of medical certainly **she would have been more timely treated** for the ventricular shunt infection **without the further brain damage caused by the further delayed** diagnosis.

(Emphasis added).

¶56. In addition to Dr. Terry, Moore also attached an expert report from Laurie Neander, a registered nurse in Mississippi. She opined that based on Jasmine's two-day history of symptoms of dizziness combined with Jasmine's known history, Nurse Kasonya Boyd breached the standard of care by "not performing a neurological assessment, not assessing the scalp, not measuring head circumference and not reporting the continued symptoms to a physician or suggesting [Jasmine] be evaluated again in the emergency room." Neander also opined that Sta-Home Nurses Kasonya Boyd and Katrina Trosper "breached the standard of care by not measuring or instructing family to measure daily head circumference[,]" explaining that "[t]he standard of care requires daily head circumference measurements to assess for increased swelling of the head in patients with hydrocephalus, especially a patient with a . . . brain infection."

31

¶57. Nurse Laurie Neander also reported that "the standard of care requires accurate documentation in a medical record" and that it was "doubtful" that Nurse Boyd "actually assessed" Jasmine's scalp as reported.[15] From her findings, Nurse Neander reported that Nurse Boyd breached the "standard of care by not assessing the scalp then recklessly documenting an expected normal assessment for [Jasmine's] post-operative period." She continued:

> Candace Hoffer, RN, breached the standard of care by exceeding the scope of her registered nurse license when she . . . saw the low blood pressure results then interpreted the blood pressure without any physician input, was due to patient age . . . the standard of care and state law requires that nurses do not diagnose patients and requires nurses to report an abnormal blood pressure to a physician.

¶58. Additionally, Moore presented the expert opinion of Dr. Kent Taub, a board-certified emergency physician who had been practicing since approximately 1994.[16] Dr. Taub's report stated that Anderson Regional Medical Center's actions were the proximate cause of Jasmine's worsening symptoms, specifically noting:

> Ms. Higginbotham signed off that she received and reviewed [the March 23, 2016] CT report . . . . However, nothing was done with this report. This [was] a very abnormal CT reading, and, especially given [Jasmine]'s recent shunt problems, ER visits, and hospitalization, **Ms. Higginbotham fell well below the standard of care** by not referring her immediately to the ER for evaluation

---

[15] Nurse Neander reached this conclusion after viewing that CHNO emergency room documented "sutures protruding through [Jasmine's] incision line," while Nurse Boyd documented that the incision line was "completely epithelialized." Nurse Neander explained that "an infectious process sufficient to protrude th[r]ough the skull's suture line is not a spontaneous disorder."

[16] Dr. Taub was the Regional Director of Hospitalist Medicine for Perseus Hospitalist Group in Huntsville, Alabama, the Medical Director for Medical Air Services Association, and an emergency room staff physician at Island Medical Management.

by a pediatric neurosurgeon. **It was Ms. Higginbotham's duty, under EMTALA**, to act on this abnormal CT finding as soon as it was received, and refer her to a[] neurosurgeon or at least an Emergency Department for further evaluation. . . . [T]he above **actions and inactions** of Ms. Higginbotham of the Anderson Regional Medical Center . . . **are the proximate cause** of the acute worsening of the neurologic and mental status as well as the continued disability and [total] care of [Jasmine].

(Emphasis added).

¶59. As is common in medical-malpractice legal disputes, the defendants' experts reached different conclusions than those reached by Moore's. Moore's experts found essentially negligence on claims not related to lost chance of recovery where the defendants' experts found none. "That one party's expert witness contradicts the testimony of the other party's expert witness should come as no surprise. We even have a name for it. We call it a 'battle of the experts.'" *Clark v. State*, 315 So. 3d 987, 997 (¶23) (Miss. 2021) (citing *Hill v. Mills*, 26 So. 3d 322, 330 (Miss. 2010)). The determination as to whose experts are victorious in a battle of the experts is **not** a duty entrusted to our trial court judges. *See Evans v. Aydha*, 189 So. 3d 1225, 1229 (Miss. Ct. App. 2016) ("A summary judgment motion does not place the trial court in the role of weighing testimony and determining the credibility of witnesses." (quoting *Jamison v. Barnes*, 8 So. 3d 238, 245 (¶17) (Miss. Ct. App. 2008))). That responsibility instead is entrusted to a jury. Indeed, "[i]t is **well-settled** law that when conflicting expert testimony is presented, the **winner in a battle of the experts is to be decided by a jury**." *Kirk v. Newton*, 380 So. 3d 252, 273 (¶53) (Miss. Ct. App. 2023) (emphasis added) (quoting *Hathaway v. Lewis*, 114 So. 3d 783, 787 (¶14) (Miss. Ct. App.

2013)).[17]

¶60.    In conclusion, I disagree with the majority's decision to affirm the grant of summary judgment in this complex medical malpractice case with numerous experts providing competing opinions. The holding that **only** Dr. McBride, as Jasmine's doctor, was the **only** expert capable of proving a lost-chance-of-recovery theory alters longstanding national standard-of-care tort law and has the potential for great mischief in the civil justice arena. Even if the majority's notion were correct, Moore brought other claims separate and distinct from those related to a failure to notify Dr. McBride, which should not have been dismissed at the summary-judgment stage. I believe the reports and testimony of the experts for Moore and the healthcare providers created genuine issues of material fact on not only the proximate cause issue but also on the many other claims not dependent on the lost-chance-of-recovery doctrine or Dr. McBride's testimony. I respectfully dissent.

**WESTBROOKS, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**

---

[17] *See also Singing River Health Sys. v. Brand*, 380 So. 3d 282, 294 (¶61) (Miss. Ct. App. 2023); *Ellison v. State*, 370 So. 3d 807, 814 (¶29) (Miss. Ct. App. 2023); *Fonville v. Zeid*, 327 So. 3d 658, 670 (¶36) (Miss. Ct. App. 2021); *K.R. Borries v. Grand Casino of Miss. Inc. Biloxi,* 187 So. 3d 1042, 1044 (¶2) (Miss. 2016); *Banks ex rel. Banks v. Sherwin-Williams Co.*, 134 So. 3d 706, 711 (¶14) (Miss. 2014); *Eli Invs. LLC v. Silver Slipper Casino Venture LLC*, 118 So. 3d 151, 155 (¶15) (Miss. 2013); *Campbell v. Calhoun Health Servs. In re Est. of Sykes*, 66 So. 3d 129, 135 (¶27) (Miss. 2011); *Hill v. Mills*, 26 So. 3d 322, 330 (Miss. 2010).